IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

October 23, 2024 Session Heard at The University of Tennessee at Chattanooga[1]

## STATE OF TENNESSEE v. CLARENCE M. PORTER

**Appeal from the Criminal Court for Loudon County**
**No. 2017-CR-123C Jeffery Hill Wicks, Judge**

———————————————————

**No. E2023-00864-CCA-R3-CD**

———————————————————

Defendant, Clarence M. Porter, was convicted by a Loudon County jury of two counts of felony murder, one count of theft of property under $1,000, and one count of especially aggravated robbery. He was also charged with possession of a handgun by a convicted felon, but following a bifurcated trial, that charge was dismissed by the trial court. The trial court imposed an effective life sentence for the felony murder, theft, and especially aggravated robbery convictions. Defendant argues that the trial court erred in admitting a hearsay statement by a co-defendant because the State failed to prove that Defendant was involved in a conspiracy with co-defendants; that the evidence was insufficient to support his convictions because there was no independent proof to corroborate accomplice testimony and the State failed to prove that he was criminally responsible for the actions of his co-defendants or that he independently possessed any criminal intent to commit the charged offenses; that the trial court erred in allowing the State's lead investigator to reference the Chattanooga Police Department's "street gangs unit;" and that the State committed prosecutorial misconduct during closing argument. Following our review of the entire record and the oral arguments and briefs of the parties, we determine that the trial court erred in admitting hearsay evidence. Further, following *State v. Thomas*, 687 S.W.3d 223, (Tenn. 2024), because the accomplice testimony was not sufficiently corroborated, we find that the evidence is insufficient to sustain Defendant's convictions. Accordingly, we reverse the judgments of the trial court and dismiss the charges against Defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Dismissed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Brennan M. Wingerter, Assistant Public Defender – Appellate Division (on appeal), Franklin, Tennessee, and Kim Nelson, District Public Defender and Harold D. Balcom, Jr.

---

[1] Oral argument in this case was heard on the campus of the University of Tennessee at Chattanooga.

and Joe Norris (at trial), Assistant Public Defenders, Kingston, Tennessee, for the appellant, Clarence M. Porter.

Jonathan Skrmetti, Attorney General and Reporter; Christian N. Clase and Katherine C. Redding, Assistant Attorneys General; Russell Johnson, District Attorney General; and Robert Edwards and Jed Bassett, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

The charges in this case arose when the victim, James Johnson, was shot and killed in his home by Christopher Blake Orr. In August 2017, a Loudon County Grand Jury indicted Mr. Orr ("Co-defendant Orr") along with LaQueena Brown ("Co-defendant Brown") and Defendant for felony murder committed during a robbery (count one), felony murder committed during a theft (count two), theft of property valued more than $1,000 but less than $2,500 (count three), and especially aggravated robbery (count four). Defendant was also charged with unlawful possession of a firearm after having been convicted of a felony (count seven).[2] Defendant's case was severed from his co-defendants'. Prior to trial, Co-defendant Brown pled guilty to facilitation of felony murder and was sentenced to twenty-two years. Co-defendant Orr pled guilty to second degree murder and was sentenced to twenty-five years. Following the disposition of the co-defendants' cases, a superseding indictment was entered reindicting Defendant on the same charges as the original indictment.

*Pretrial Motions*

Prior to trial, Defendant filed a Motion in Limine seeking to exclude a document produced by the State titled, "Christopher Blake Orr 423-457-5330 Phone Activity Timeline from Phone Extraction . . . for a portion of May 10, 2017 and May 11, 2017," arguing that the document contained inaccurate information and that phone calls and text messages without content between Co-defendant Orr and Defendant were not relevant and would be the subject of speculation. While there was no evidence presented as to why some of the text messages had no content, the State noted:

> Then there's, a little frustrating here, at 7:01 there's an incoming call, or text message from both [Co-defendant] Porter and [Co-defendant] Brown, but our dump gives us no [content], and we don't know why that happened, it's an aberration, it may be that those texts were deleted, it may be that they simply weren't recorded for whatever reason but there is no content to them.

---

[2] This count was later renumbered to count five in Defendant's trial.

Defendant also sought to exclude two photographs from Co-Defendant Orr's phone extraction as not relevant: one photograph showed an unknown man bagging items at a store and the other showed Co-defendant Orr in a vehicle with two other occupants, neither of whom were involved in this case.[3] Defendant further sought to exclude specific text messages between himself and Co-defendant Orr as inadmissible hearsay and unfairly prejudicial.[4] In his motion, Defendant raised the issue of lack of corroborating evidence to support accomplice Co-defendant Brown's testimony.

The State filed a "Notice of Intent to Introduce Certified Records Pursuant to Tennessee Rules of Evidence 803 and 902," specifically Verizon Wireless cell phone records of two numbers for Co-defendant Brown, Verizon Wireless cell phone records of Co-defendant Orr, T-Mobile cell phone records of Defendant, and AT&T cell phone records of the victim.

The trial court conducted a hearing on January 19, 2022. No witnesses testified, but Defendant entered as exhibits the material he sought to exclude along with other documentation from Co-defendant Brown's Facebook records and text messages, reports and audio recordings from her multiple interviews with law enforcement, her hand-written statement, and a letter she wrote to her "Aunt Fay." The State entered the phone records it sought to introduce.

Following the hearing, the trial court entered a written order which contained the following:

> Based upon the motion in limine and attached exhibits, the State's response to the motion, and the arguments of counsel during the hearing, the court finds that the State has proven by a preponderance of the evidence that the three co-defendants entered into a conspiracy to either rob or steal from the victim, James Johnson. As such, the evidence of communications between the defendants by either text messages, Facebook messages, or phone calls will be admissible at the trial in this matter under Rule 803(1.2)(E), provided that the State can prove at the trial that these communications were made during the pendency of the conspiracy and in furtherance of the conspiracy. The court further finds that the text messages and phone call logs are non-testimonial and would not be subject to the Confrontation Clause.

> At this time, the Motion in Limine regarding the text messages and phone communications is denied. However, if the State is unable to prove the

---

[3] The trial court did not address the photographs in its order following the hearing. They were introduced at trial but are not an issue on appeal.

[4] The actual text messages and context of the messages at issue will be discussed in the Trial facts section below.

conspiracy during the trial on this matter, [D]efendant will be allowed to renew his motion.

In regard to [D]efendant's objection to Exhibit 1, (Christopher Blake Orr's phone activity timeline) the State will be allowed to enter this information into evidence provided the errors identified by [D]efendant are corrected.

In regard to [D]efendant's objection to the admissibility of text messages with no content and phone calls between himself and Orr, the court finds that the evidence of phone calls between the two co-defendants will be admissible to show that they were in contact with each other on May 10-11, 2017.

In regard to [D]efendant's arguments concerning accomplice testimony and corroboration, the court finds that this issue is best suited to be addressed during the trial if Brown and/or Orr testify.

*Trial*

Co-defendant Brown knew the victim's son and met the victim "through two other females" on April 16, 2017, when the victim picked her up in Soddy Daisy along with the two other women. Co-defendant Brown was living in Dayton with a friend at the time. After the victim agreed to pay her to sell his "roxies" in Dayton, she began staying with him overnight at his home in Loudon County. On May 9, 2017, after Co-defendant Brown sold all the drugs the victim had given her to sell, the victim picked her up, and she gave him all the cash from the sales. The victim was supposed to pay her a portion of the proceeds, but when he would not pay her, they fought, and the victim ordered her to get out of his home. Co-defendant Brown agreed to leave if the victim drove her back to his house for her to get her clothes. On the way back to the victim's house, Co-defendant Brown testified that they picked up another woman, "a booster," who was "going to steal some things" for the victim from Walmart, and "he was going to pay her in dope." However, the woman "ended up not doing it," and the victim and Co-defendant Brown dropped her off at another location, and they continued to the victim's house.

Back at the victim's home, the victim and Co-defendant Brown continued to fight both verbally and physically. Co-defendant Brown testified that the victim choked her with his left hand, cut her on the arm with a knife he had in his right hand, and threatened that she would never see her children again. Sometime around 4:00 or 5:00 a.m., Co-defendant Brown went into the bathroom and began calling and texting people to find someone to pick her up. She called her "baby daddy," Josh Crabtree, who refused to come. She also sent him a text message stating, "ima either take wat I can for collateral or stay

hea or try to get somebody to come hea til I get wats owed to me."[5]  She explained that she was upset that the victim did not pay her, and she was going to take something from his home.  She also called James "Jimbo" Banks who hung up on her after she asked for a ride.  During her trial testimony, Co-defendant Brown identified a text message she sent on May 10, 2017, at 5:41 a.m. that said, "[o]n some real b**ch sh*t, can uu send one your shootas my way, real talk, Mafka[.]"  She explained that the message was sent to her by Josh Crabtree for her to send to James Banks and that she was not asking for gunmen.

Co-defendant Brown testified that she then received an incoming call from a number she did not recognize.  The call was from Co-defendant Orr whom she had met approximately ten years prior.  She had not heard from him until the day prior when she received a Facebook message from him and gave him her phone number so they could reconnect.  She explained her situation with the victim to Co-defendant Orr, and he agreed to drive from Chattanooga to pick her up.  She texted him an address on Vytron Road in the City of Loudon ("Loudon"), which she later realized was the victim's work address.  After going through the victim's mail, she found his home address and sent that address to Co-defendant Orr.  She also texted Co-defendant Orr at 7:41 a.m., saying "he keep talking crazy doe, smh" which she explained meant "shaking my head" and "uu ain gotta come, ion want uu dis fkd upp BS i can take his perverted a** reall sh*t dude js mad[.]"  She explained that meant she was just mad.

At 7:12 a.m., Co-defendant Brown sent a text message to Co-defendant Orr stating, "Mann I feel like a str8 weak punk if i leave."  And then at 7:42 a.m., she texted him, "soon as uu walk in the house there is a flat screen tv to your left" and then she sent a picture of a television.  When she later called Co-defendant Orr to see how long it would take him to arrive, the victim could be heard in the background "still talking crazy."  Co-defendant Orr advised her not to talk to the victim and to get out of the home, so Co-defendant Brown put her clothes in a tub and two bags, took them outside, and sat on the victim's truck to wait for her ride.  The victim came out and put his phone down on the truck.  Co-defendant Brown told him she found someone to come pick her up, and he said, "you're not going anywhere unless I'm ready for you to go."  He then took her clothes back inside his house.  Co-defendant Brown grabbed the victim's phone and "took off walking" down the road and talking on her phone to Co-defendant Orr.  She was unsure what time of day it was, but did recall that it was daylight.

Co-defendant Orr got lost but eventually picked up Co-defendant Brown on the side of the road near the victim's home.  Co-defendant Brown saw another person in the passenger seat of Co-defendant Orr's car, later identified as Defendant, whom she did not know or recognize; she later came to know him only as "Money."  She got in the back seat and told Co-defendant Orr to drive back to the victim's home so she could get her clothes.

---

[5] For accuracy, we have quoted the co-defendants' text messages as they appear in the exhibits of the phone records rather than how they appear in the trial transcript.

She still had the victim's phone. After arriving at the victim's home, Co-defendant Brown knocked on the door and asked the victim where her clothes were. At trial, she testified that she kept the victim's phone until she could verify that none of her clothes were missing.

While Co-defendant Brown was checking her clothes, she saw the victim run into the home, and Co-defendant Orr chasing the victim with "his arms out." She said she "never seen a gun." Co-defendant Brown testified at trial that she left the victim's phone beside the television and picked up her clothes in the tub. While walking to the car, she heard what she thought "was a firework." Co-defendant Brown screamed, dropped the tote, and went back into the house. While she did not remember "passing" Defendant on her way out, she testified that when she went in, Defendant was in the house standing there with his hands in his pocket. She testified that she asked Defendant about something she smelled in the home, and that he said, "if I knew there was anything here for real, for sure, I'd be searching." She then saw the victim on the floor, turned him over and saw "the hole in him." When she asked Co-defendant Orr what he had done, he ordered her to get in the car which she did. Defendant followed. Co-defendant Brown asked about her clothes, and Co-defendant Orr threw them in the trunk of the car and left the tote in the yard. The door to the home was left cracked open. Regarding the victim's phone, she said she "didn't grab it. But it was in our possession."

Co-defendant Orr then began driving back to Chattanooga. They stopped for gas and when Co-defendant Orr left the vehicle to go inside the store, Co-defendant Brown asked Defendant, "Why did he do that back there[?]" Defendant replied, "he's geeked," and he showed her a bag of methamphetamine. She bought twenty dollars of the drug from Defendant. Co-defendant Orr came back out of the store, and Co-defendant Brown gave him her "EZ card" to go back inside and get her some water. He came back outside again, pumped gas, and got back in the car. During the drive, Defendant did not "really say nothing at all" and was on his phone most of the time. Co-defendant Orr coached Co-defendant Brown on what to say about the crime.

Co-defendant Brown testified that at some point during the drive, Co-defendant Orr handed the victim's phone to Defendant who "took it and threw it out the door in the Chickamauga Dam River as we went across the bridge." When they got to Chattanooga, they went to a house where only Co-defendant Orr went in. When he returned, they drove to Sandy's Mini Mart where again only Co-defendant Orr went in. They then traveled to Defendant's home. Co-defendant Brown testified that Co-defendant Orr backed into the driveway and gave Defendant a gun wrapped in a gray bandana, saying, "here's your gun back," and the two of them went inside. Co-defendant Brown stayed outside and moved to the front seat of the car.

Defendant stayed at his home, and Co-defendants Orr and Brown drove to the Econolodge in Tiftonia. Co-defendant Brown gave Co-defendant Orr money to pay for the room. They got into an argument at the hotel, and Co-defendant Orr left for the night. The

next day, Co-Defendant Brown met two men at the hotel, and they drove her to the health department to get a copy of her birth certificate and then returned to the hotel where she saw Co-defendant Orr backing out of the parking lot. She reached out to him through a Facebook message asking him to come back and get her which he did, and she left with him. She used Facebook to communicate because they both had changed phone numbers, and she did not have his new number. She called her cell phone provider and changed her number "from a 423 to a 404 area code." She had no contact with Defendant after they left him at his home. Co-defendant Brown testified that the next day after the shooting, on May 11, 2017, Co-defendant Orr confirmed to her that he shot the victim. She said that Co-defendant Orr also threatened her son's life by stating: "b**ch, if you tell anybody what I did I know where your son lays his head."

On cross-examination, Co-defendant Brown agreed that she was interviewed three times prior to trial and that all of the interviews had been recorded. She also made a written statement, wrote a detailed letter to her Aunt Fay, and made a three-page long written proffer when she entered her guilty plea. She agreed that during her first interview on May 12, 2017, she initially told law enforcement that the victim took her to Chattanooga in his vehicle on May 10, and that she had not seen him since. At trial she said she did not remember making that statement, but that she was high during the interview. She told her Aunt Fay in the letter that she was "on the streets for a week and a half, started staying in Loudon County, only to clean [the victim's] house and help him around his house and him pay me." She did not recall when he asked her to sell roxies for him, but she agreed to do so only in Rhea County. In addition to selling the roxies, she was also selling her food stamp cards. She admitted she knew both activities were illegal.

Co-defendant Brown admitted that on the day of the shooting, her plan was to get a ride out of Loudon County and rob or steal from the victim because he owed her money. She sent several text messages to other individuals about stealing from the victim. To one individual, she stated, "It will be worth the drive but pls pls come get me when uu get hea" and "uu can have whatever you want." She said she was saying whatever she could to get someone to come get her, including a message that said, "Brother you can come on up here and steal from this man and I'm willing to help you do that." She also had pictures of two televisions on her phone.

Co-defendant Brown admitted that in three prior interviews, two of which were with the Tennessee Bureau of Investigation ("TBI"), she told law enforcement that nothing was taken from the victim's home. In her prior interviews she also told law enforcement that she had the victim's phone the entire time. In her July 5 interview, she told law enforcement that Co-defendant Orr and Defendant took her phone and put it in the front of the car. She had the victim's phone "back here," and Co-defendant Orr "snatched it from [her]." Her testimony at trial was the first time she said that Defendant was in the victim's home and told her, "If I knew if anything was in here, I'd be looking." She also admitted that her trial testimony was the first time she said that when they got to Defendant's home,

- 7 -

Co-defendant Orr handed Defendant the gun he used to shoot the victim and said, "here's your gun back." Co-defendant Brown testified that she was high during all of her interviews, but after listening to the July 5 interview at trial, she agreed that she said she still had the victim's phone in the car after she left with Co-defendant Orr and Defendant, and "they snatched it from" her, later clarifying that Co-defendant Orr was the one who took the phone from her, and Defendant threw it off the bridge. She also admitted that in her July 5 written statement she told law enforcement Defendant never got out of the vehicle at the victim's home and that Defendant said to Co-defendant Orr, "what you jumping out for, get your a** back in the car." She said that she heard "tussling" after Co-defendant Orr went into the house and heard him say, "if you ever touch her again, I'll kill you."

Co-defendant Brown consistently testified that she never saw Defendant take anything and never saw him in possession of anything taken from the victim's home. She never saw Co-defendant Orr take anything from the home, but he was the last one out of the home. She testified consistently, including at trial, that as far as she could tell, nothing was taken from the house.

Dr. Darinka Mileusnic-Polchan performed the autopsy on the victim. She testified that the victim was shot one time, and that shot "pretty much perforated the main vessels that come off the base of the heart, the base of the aorta, the aortic valve[,]" perforated the spine and severed the distal spinal cord. The victim could not have survived the injury. She also reviewed eleven items noted on her report as "additional evidence of injury" which included bruising in the chest, hip, and scapula areas as well as broken ribs, abrasions and other contusions all consistent with a struggle. She noted that those injuries were sustained while the victim was still alive.

Ben Harris, the victim's brother-in-law, worked with the victim at M&M Marine at the time of the offense. Mr. Harris was a boat mechanic, and the victim periodically did maintenance for M&M Marine in addition to his other jobs. On May 10, 2017, Mr. Harris was scheduled to meet the victim at work at 8:00 a.m. Mr. Harris went fishing on the lake "in the cove between Tellico and Loudon" prior to work. While fishing, the victim called Mr. Harris "sometime right after 7:00" to let Mr. Harris know that the victim was having some "things" that were "slowing him down from already being there waiting on [Mr. Harris]." When Mr. Harris got to M&M Marine, he called the victim several times, and the victim did not answer his phone. After "about [thirty] minutes or so," Mr. Harris called his wife, Eva Jane Johnson, the victim's sister, to let her know the victim had not shown up for work and was not answering his phone.

Ms. Johnson was at work and called the victim. She left a couple of voice messages, but at some point "around 10:00" a.m. her calls were no longer going to voicemail. When she got a break from work between 2:00 and 3:00 p.m., she drove to the victim's home to check on him. When she arrived, there was a "drawer from like a chest of drawers that

was just blocking the door open." She went in and saw a tote that "had like clothes and a bunch of items sitting around" and called for the victim. The home was messier than usual, and she noticed potting soil all over the floor. She then saw the victim lying in the doorway to the utility room. He was "cold, he was gone." She then went outside, called 911, and waited for police to arrive. Mr. Harris also arrived to wait with her. Ms. Johnson cooperated in the investigation.

Detective Brian Jenkins of the Loudon Police Department ("LPD") was dispatched to the victim's home on May 10, 2017, "a little after 3:00 in the afternoon" and arrived in "[a] couple of minutes." Another officer was the first on the scene and told Detective Jenkins "it appeared that there was a gunshot wound." Because the LPD is a "very small municipal department," Detective Jenkins called to get help with the investigation from the TBI who came and processed the scene. Detective Jenkins identified photographs of the outside and inside of the victim's home, and those photographs were exhibited to his testimony. There was a photograph of one .40 caliber shell casing found in the home. Photographs also showed potting soil on the floor next to a computer stand and a bed and additional potting soil on "the patio-type area . . . that's been dumped out of something."

After talking with the victim's family, Detective Jenkins began focusing on "some female companions" of the victim, but those individuals had alibis. Detective Jenkins then turned his focus on the victim's "soon to be ex-wife" until he was told by the TBI that they had determined the victim had been with Co-defendant Brown and another female in Dayton the previous night. The other female was cleared, and Detective Jenkins spoke with Co-defendant Brown three different times. From those interviews, Co-defendant Orr and Defendant were developed as additional suspects, and surveillance video was obtained from Sandy's Mini Mart and several other stores. Search warrants were also issued to obtain data from the suspects' cell phones.

On cross-examination, Detective Jenkins agreed that a blue tote was found outside the victim's home, and a bag later determined to belong to Co-defendant Brown was in the home. A television set, computer monitor, and computer equipment were also in the home. Detective Jenkins agreed that one of the photographs showed two pills on the bed in the second room to the right in the home, and there was a photograph of the victim's truck parked outside the home showing a pill bottle and a cell phone inside the vehicle. That cell phone was not processed, and Detective Jenkins did not recall if anyone determined the contents of the pill bottle. The victim's home had a non-functioning surveillance system. Detective Jenkins also agreed that when he and TBI Special Agent Jason Legg interviewed Defendant, Defendant denied being involved in a killing and explained that he knew Co-defendant Orr "because of bully dogs."

In May 2017, Special Agent Legg was a criminal investigator assigned to the Ninth District which included Loudon County, and he investigated the victim's death. After interviewing the victim's son, Special Agent Legg reviewed video recordings from a

market in Dayton from which he identified two females, Cassie Parrott and Co-defendant Brown. Co-defendant Brown's interview led him to Co-defendant Orr and another suspect who went by the name "Money." Special Agent Legg met with the Chattanooga Police Department "street gangs unit" in an effort to identify and locate "Money." He found information that led him to Defendant's mother's Stuart Street home where he interviewed Defendant's mother. Defendant's mother called Defendant, and he came home to be interviewed by Special Agent Legg. Defendant denied involvement in the murder and denied having been in Loudon; he admitted meeting Co-defendant Orr and a girl at Sandy's Mini Mart. He turned his cell phone over to Special Agent Legg. Shortly into Defendant's interview, Defendant asked for an attorney, and the interview stopped. Special Agent Legg did not record the interview.

Special Agent Legg ultimately collected two cell phones from Co-defendant Brown and one each from Co-defendant Orr and Defendant. He obtained warrants for those phones and for the cell phone provider of the victim's phone which was owned by Catherine D. Lemacks. Special Agent Legg conducted two interviews with Co-defendant Brown which he described as "incomplete" and "inconsistent." He also said she was crying, sobbing, and shaking during the interviews. Co-defendant Brown admitted that she and the victim were selling drugs, but Special Agent Legg said that there were no drugs at the victim's home other than some "marijuana plants or something." On cross-examination, he admitted there were two pills in the victim's home as shown in a photograph taken at the crime scene.

Agent Cortney Dugger with the 9th Judicial District Attorney General's Office testified as a digital evidence expert. He conducted extractions on the phones Special Agent Legg collected from Co-defendant Brown, Co-defendant Orr, and Defendant, and he reviewed the data from the victim's cell phone provider. He testified:

> In general there's several areas that you can look at on the phone extraction for potential of where that device has been or where the files even on that device has been, meaning where they came from. Some cell phones record how they interact with cell towers, where they receive signals, and we can extract that. Some cell phones will extract – will store, networks they connected to. Home networks, Wal[-]mart, wherever, some will store that. Some location information is found in what's called exodata, and that's, if you take a picture, depending on your phone settings, there may be location information inside of those pictures. Those are the main areas that I can think of that would refer to location.

He further agreed that when receiving a set of data from a cell phone service provider, he "most of the time" and depending on the process used, also received location information. He marked the locations from the extraction reports and cell phone provider data on a map.

Agent Dugger testified that information from the victim's phone records showed that at 8:00 a.m. on May 10, 2017, the phone was connected to a cell phone tower at 201 Hill Street in Loudon. While there were no connections between Loudon and Chattanooga, between 10:15 and 10:21 a.m., the phone connected to towers in the Chattanooga area. Agent Dugger explained that the phone could have been off, in airplane mode, or frozen when it made no connections. The last point the phone was traceable was near the highway traveling across Chickamauga Dam near Chattanooga State Community College. Agent Dugger noted that if he had been able to perform an extraction on the victim's phone, which was never found, he could "possibly" have gotten more location information.

Co-defendant Orr's phone extraction did not give location information, but Agent Dugger was able to determine that information from the cell phone provider. At 6:12 and 6:50 a.m. on May 10, 2017, records showed that Co-defendant Orr's phone was in Chattanooga. From 7:59 a.m. through 8:18 a.m. it was in Loudon; by 8:52 a.m., it was in the Sweetwater area and then it was back to Chattanooga at Sandy's Mini Mart from 9:51 a.m. through 10:55 a.m. Agent Dugger clarified that when discussing the location of the phone, he meant towers "that the phone [was] communicating with."

Defendant's cell phone provider records started at 6:31 a.m. on May 10, 2017, and showed the farthest north the phone hit on a tower was south of Athens, not even mid-way between Chattanooga and Loudon. However, Agent Dugger also did a forensic extraction on Defendant's phone which showed that at 6:01 a.m. the phone was connected to a wi-fi network at 2601 Stuart Street in Chattanooga, which was Defendant's home. The phone signal then traveled north on I-75, and around 7:48 a.m. hit "right near Loudon." At 8:43 a.m., it went south, was near Sweetwater at 8:51 a.m., and was then back in Chattanooga at 9:41, 10:24, and 10:55 a.m. Agent Dugger prepared a power point presentation of the connections showing Defendant's phone's location, which was entered as a collective exhibit to his testimony.

Agent Dugger testified that he had experience and training in understanding short form words used in text messaging. He prepared a summary of phone activity and communications to and from Co-defendant Orr's phone, and obtained text message data from the phone extraction. He had also pulled the internet search history from Co-defendant Orr's phone. His summary showed sixty-nine contacts between Co-defendant Orr and Defendant and twenty-nine contacts between Co-defendant Orr and Co-defendant Brown. Agent Dugger agreed that the contacts could have been made over a few days or a few months. Agent Dugger's summary of Co-defendant Orr's phone activity was exhibited to his testimony.

Agent Dugger noted several calls and text messages from 5:47 a.m. through 8:17 a.m. on May 10, 2017, between Co-defendant Orr and Co-defendant Brown as well as between Co-defendant Orr and Defendant. Some of the text communications between Co-defendant Orr and Defendant had no content. The report showed that no contact was ever

made between Co-defendant Brown and Defendant. Defense counsel then made the following objection to the admission of the text messages: "And your Honor, for the record, of course, the same objection that we had in the Motion in Limine so that we don't have to go through all those." The trial court replied: "Very well, the objection is overruled." Agent Dugger then testified that at 8:44 a.m., corresponding with the phone records showing that co-defendants were on the return trip to Chattanooga, Co-defendant Orr sent Defendant a text message saying, "Shoulld I do her too[?]" At 10:28 a.m., Defendant sent Co-defendant Orr a text message saying, "Take me to sa[n]dys[.]" At 10:50 a.m., Defendant messaged Co-defendant Orr, "Totally violated brh frfr" which Agent Dugger explained meant "totally violated, bro, for real, for real." Co-defendant Orr responded at 10:52 a.m., "Lol luv ya cuz but I'm tryna take care something I got you though[.]" The phone records showed continuing calls between Co-defendant Orr and Defendant throughout the evening of May 10 and into the early morning hours of May 11, 2017. During that same period, Co-defendant Orr's phone records showed multiple internet searches for Loudon County news and Loudon County Sheriff's office, including access to an article with the headline "Victim Identified in Robbery Homicide."

On cross-examination, Agent Dugger admitted that Defendant's cell phone records also showed a connection in Albuquerque, New Mexico. He explained that the connection was a data error which is "not an uncommon thing" and did not impact the overall data. Defendant's cell phone data also showed that both on the trip to Loudon and back to Chattanooga, Defendant spent much of the time accessing YouTube and that Defendant sent pictures of dogs to Co-defendant Orr.

At the close of the State's proof, Defendant moved for a judgment of acquittal on all counts arguing that the State did not prove theft because the victim was not the owner of the phone taken from his home and that the State had not proven that anything else was taken from the victim's home. Defendant argued that Co-defendant Brown testified that Co-defendant Orr said he did not want the television she had previously referenced, and no televisions were missing from the home. Defendant also argued that there was no proof of his intent to participate in the crime and the fact that he told Co-defendant Orr to get back in the car was proof that he did not intend to be involved. The State argued that the lack of money and drugs in the victim's home could be proof of theft and that the victim had a possessory interest in the phone. The State conceded that any theft would be a misdemeanor under $1,000. After the trial court denied the motion, Defendant elected not to testify and offered no proof at trial.

The jury convicted Defendant as charged for felony murder in perpetration of especially aggravated robbery, felony murder in perpetration of theft of property, theft of property under $1,000, and especially aggravated robbery. The trial court then began proceedings on the bifurcated portion of the trial on the charge of being a convicted felon in possession of a handgun. After opening statements, the State offered into evidence a certified copy of Defendant's 2003 Hamilton County conviction for attempted aggravated

robbery. The trial judge then granted Defendant's motion for judgment of acquittal on the handgun charge finding that Co-defendant Brown's testimony was the only proof that Defendant was in possession of a handgun and that there was no corroborating evidence of her accomplice testimony. Following a sentencing hearing,[6] the trial court imposed life sentences for the felony murder convictions and merged those counts, and sentenced Defendant to eleven months and twenty-nine days for the theft conviction and eighteen years for the especially aggravated robbery conviction and merged those counts, running all counts concurrently.

Defendant filed a timely motion for new trial which was denied by the trial court. Defendant's timely appeal is now properly before this court.

**Analysis**

Defendant argues that because there was no independent proof to corroborate Co-defendant Brown's accomplice testimony, there was insufficient evidence to prove that he is criminally responsible for the actions of his co-defendants or that Defendant independently possessed any criminal intent to commit the charged offenses. Defendant alternatively argues that because the trial court erred in admitting hearsay statements by Co-defendant Orr because the State failed to prove that Defendant was involved in a conspiracy with Co-defendants Orr and Brown, he is entitled to a new trial. Defendant further argues that the trial court erred in allowing the State's lead investigator to reference the Chattanooga Police Department's "street gangs unit" and that the State committed prosecutorial misconduct during closing argument.

## I. Sufficiency of the Evidence

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable

---

[6] The State had filed a petition to seek life without the possibility of parole but withdrew that petition before sentencing.

and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

As relevant to this appeal, first degree felony murder is defined, in relevant part, as the "killing of another committed in the perpetration of or attempt to perpetrate" a robbery or theft. T.C.A. § 39-13-202(a)(2). A culpable mental state is not required for a conviction, except the intent to commit the underlying felony. *Id.* § -202(b). The defendant "must intend to commit the underlying felony at the time the killing occurs." *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Our supreme court has held that "in determining whether the evidence is sufficient to support a conviction of first degree murder in the perpetration of theft, a court must determine whether the killing is closely connected to the *initial taking* of the property in time, place, causation, and continuity of action." *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000) (emphasis added). This is because "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *Wharton on Homicide*, § 126 (3d ed.) (omission in original)).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Especially aggravated robbery is a robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. *Id.* § 39-13-403(a). A person commits theft "if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a).

Under the theory of criminal responsibility, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." *Id.* at § 39-11-401(a). Criminal responsibility for the actions of another arises when a defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* at § 39-11-402(2). Criminal responsibility is not a separate

crime but a "theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). However, "the evidence must establish that [the] defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013).

At the time of the offenses in this case, Tennessee law provided that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024) (citations omitted). The supreme court in *Thomas* abolished the requirement for corroborative testimony of an accomplice but did so only on a prospective basis. *Id.* at 242. Because this appeal was pending when the *Thomas* decision was announced, we apply the former common law accomplice corroboration rule to this case. *Id.*

Our supreme court has described the accomplice-corroboration rule as follows:

[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). An accomplice is defined as "one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *Thomas*, 687 S.W.3d at 239 (quoting *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004)). "A witness qualifies as an accomplice if that witness could be indicted for the same offense charged against the defendant." *Id.* at 239-40 (citation and internal quotation marks omitted).

In *Thomas*, Co-defendant Turner was convicted of three counts of first degree premeditated murder under the theory of criminal responsibility. The supreme court found that her murder convictions must not be solely based on the uncorroborated testimony of one or more accomplices. *Thomas*, 687 S.W.3d at 249. The court reiterated that "[e]vidence which merely casts a suspicion on the accused or establishes he or she had an opportunity to commit the crime in question is inadequate to corroborate an accomplice's testimony" and that "evidence that the accused was present at the situs of the crime and had the opportunity to commit the crime is not sufficient." *Id.* at 250 (citations omitted). The court evaluated the evidence and the State's argument that five pieces of evidence corroborated the accomplice testimony of Co-defendant Hawkins. *Id.* Co-defendant Hawkins had testified that Co-defendant Turner entered the room after one of the victims had already been shot and was lying on the ground, asked if she was dead, and when Co-defendant Hawkins said, "I guess so," asked for his gun and shot the victim. He further testified that Co-defendant Turner got into the vehicle with the co-defendants after the murder, holding some marijuana that she had stolen from the scene. *Id.* at 236.

The court specifically noted that evidence Co-defendant Turner was present at the scene of the crime was insufficient to corroborate accomplice testimony, even under a theory of criminal responsibility. *Id.* at 251. Evidence that Co-defendant Turner's car was seen at the crime scene failed to confirm that she participated in the murders or was criminally responsible for the conduct of other defendants. *Id.* There was also a phone call after the crime with suggestions by Co-defendant Thomas that Co-defendant Turner "stick to the script." The court found that Co-defendant Thomas' efforts to cover for himself were not sufficient evidence that Co-defendant Turner committed a crime. *Id.* After considering all of the corroborating evidence, the court reversed and dismissed the charges against Co-defendant Turner concluding that the corroborating evidence fell short of "confirming that [Co-defendant] Turner committed the crimes she has been convicted of, whether 'through her own acts or through the acts of another for whom she was criminally responsible.'" *Id.* at 252.

In this case, Defendant argues on appeal that because there was no independent proof to corroborate Co-defendant Brown's accomplice testimony, the State failed to prove that he was criminally responsible for the actions of his co-defendants or that he independently possessed any criminal intent to commit the underlying felonies of theft or robbery to support his felony murder conviction. It is undisputed that Defendant did not shoot the victim. It is also undisputed that Co-defendant Brown was an accomplice and that Defendant's convictions were based on her testimony. Thus, under *Thomas*, we must evaluate the evidence corroborating Co-defendant Brown's testimony. In its brief, the State argues that the corroborating evidence includes the following:

1. Cell phone location data establishing that Defendant traveled with Co-Defendant Orr to and from Loudon County, that he was present when Co-defendant Orr killed

the victim, and that the victim's cell phone was disposed of on the way back to Chattanooga.

2. Text messages between Defendant and Co-defendant Orr. Specifically, the State argues that Defendant's message "Totally violated brh frfr" could have been construed by jurors to mean Defendant aided and participated in Co-defendant Orr's crimes. "Shoulld I do her too[?]" could be construed as Co-defendant Orr asking Defendant if he should kill Co-defendant Brown to cover up the crime, indicating Defendant was an active participant because his opinion was asked.

3. Defendant's phone calls with Co-defendant Orr. While the State admits there is no proof of the content of the calls, it argues that the number of phone calls between Defendant and Orr following the period of time during which Co-defendant Brown sought help from other people via text messages and indicated her intent to take collateral for the money the victim owed her was sufficient corroboration.

Defendant argues that such evidence corroborates nothing more than Defendant's mere presence at the victim's home and not that Defendant had the requisite intent to commit a theft or robbery.

The cell phone tower location data showing that Defendant traveled with Co-defendant Orr from Chattanooga to the victim's house in Loudon County and returned to Chattanooga following the shooting shows no more than Defendant's presence at the situs of the crime. And while the victim's cell phone location data indicates that the victim's cell phone stopped receiving and sending signals at the location where Co-Defendant Brown testified Defendant threw the phone off a bridge, we do not find this evidence to sufficiently prove or corroborate any intent of Defendant to commit the charged offenses or to promote or assist in the charged offenses. As pointed out by Defendant's brief, this evidence would likely support a charge as an accessory after the fact, but he was not charged with that offense.

As described in our analysis of the hearsay issue, the text messages between Co-defendant Orr and Defendant were unclear and subject to interpretation. Co-defendant Orr sent Defendant a message asking, "Shoulld I do her too[?]" Defendant did not respond to the message[7] and the cell phone extraction data showed that Defendant was on YouTube much of the drive back to Chattanooga. Defendant's message to Co-defendant Orr referencing being "Totally violated" again has no clear meaning, and Co-defendant Orr's response added no clarification. We do not find that evidence corroborative of any intent

---

[7] We have determined that this text message was improperly admitted by the trial court. Nevertheless, it was considered by the jury in determining whether the evidence was sufficient to support Defendant's convictions.

- 17 -

of Defendant to participate in a robbery or theft or the Defendant was in any way criminally responsible for the actions of the co-defendants.

The cell phone records confirm that Co-defendant Orr and Defendant communicated immediately after Co-defendant Brown asked Co-defendant Orr to come pick her up in Loudon County. However, there was no proof of the content of those conversations. And while there is proof that Co-defendant Brown sent messages to other people seeking help and indicating her intent to take collateral for the money the victim owed her, the proof showed that Co-defendant Orr did not want the television Co-defendant Brown offered and there was no proof of any communications of any kind between Co-defendant Brown and Defendant.

Other potentially corroborating evidence at trial not mentioned in the State's brief include documentation that Co-defendant Brown's EBT card was used at Sandy's Mini Mart in Chattanooga and surveillance video from the market showing Co-defendants Brown and Orr in the market at 9:30 a.m. after the victim's murder on May 10, 2017. However, again none of this evidence affirms Defendant's "participation in the murders, whether through [his] own acts or through the acts of another for whom [he] was criminally responsible." *Thomas*, 687 S.W.3d at 250.

At trial, Co-defendant Brown testified that when they returned to Chattanooga and arrived at Defendant's home, Co-defendant Orr gave Defendant a gun wrapped in a gray bandana and said, "here's your gun back." However, the trial judge ruled that testimony was not sufficiently corroborated and granted Defendant's motion of judgment of acquittal at the conclusion of the bifurcated hearing on Defendant's handgun possession charge.

Prior to the *Thomas* decision, the evaluation of the corroborating evidence could be viewed to connect Defendant to the commission of the offense; the evidence was certainly slight and when standing alone, entitled to little consideration. However, because we find this case very similar to *Thomas*, following the supreme court's analysis, we are constrained to conclude that the evidence was not sufficient to support Defendant's convictions based on Co-defendant Brown's accomplice testimony even under a theory of criminal responsibility. The corroborating evidence presented at trial through the cell phone records merely established Defendant's presence at the scene and that he had an opportunity to commit the crimes for which he was convicted. There was no adequate corroboration that Defendant acted with intent to promote or assist in the offenses in this case or to benefit in the proceeds or results of the offenses. Furthermore, this same evidence fails to show that Defendant intended to commit the underlying felonies of theft or robbery to support his felony murder conviction. Because we conclude that the evidence was insufficient to support Defendant's convictions for felony murder, theft of property under $1,000, and especially aggravated robbery, we reverse and dismiss the convictions.

However, in the event of further appellate review, we will address Defendant's remaining issues.

## II. Admission of Hearsay

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). The Tennessee Supreme Court has explained that the appellate standard of review for ruling on hearsay evidence has multiple layers:

> Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. *State v. Gilley*, 297 S.W.3d [739, 760-61 (Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions- whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule – are questions of law subject to de novo review. *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W. 3d 703, 721 (Tenn. Crim. App. 2005).

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

One exception to the hearsay rule is the statement of a co-conspirator. *See* Tenn. R. Evid. 803(1.2)(E). Under this exception, hearsay is admissible if it constitutes "a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." *Id.* "Casual conversation between or among co-conspirators is not considered to be in furtherance of the conspiracy." *State v. Carruthers*, 35 S.W.3d 516, 556 (Tenn. 2000) (citing *State v. Hutchison*, 898 S.W.2d 161, 170 (Tenn. 1994)).

Before a co-conspirator's statement can be admitted, the existence of the prerequisite conspiracy must be proven by a preponderance of the evidence. *State v. Berry*, 141 S.W.3d 549, 585 (Tenn. 2004) (citing *State v. Stamper*, 863 S.W.2d 404, 405-06 (Tenn. 1993)). "A conspiracy is defined as a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means." *State v. Alley*, 968 S.W.2d 314, 316 (Tenn. Crim. App. 1997). An implied understanding rather than formal words or a written agreement between the parties is sufficient to prove a conspiracy. *State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992). A conspiracy may be shown by

"a mutual implied understanding," circumstantial evidence, and the parties' conduct. *Id.*; *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). Furthermore:

> To be admissible under the co-conspirator hearsay exception, a statement must be made "during the course of" a conspiracy. This means that the conspiracy must have been occurring or ongoing at the time the statement was made. *See State v. Walker*, 910 S.W.2d 381, 385 (Tenn. 1995); *Gaylor*, 862 S.W.2d at 554; Neil Cohen et al., *Tennessee Law of Evidence* § 803(1.2)(6) (3d ed. 1995). If the conspiracy had not begun or had already concluded when the statement was made, the statement will not be admissible under the co-conspirator exception. [*Gaylor*, 862 S.W.2d at 554]. The exception also requires that the statement be "in furtherance of" the conspiracy. In short, the statement must be one that will advance or aid the conspiracy in some way. *See State v. Heflin*, 15 S.W.3d 519, 523 (Tenn. Crim. App. 1999).

*Carruthers*, 35 S.W.3d at 555. Statements made in furtherance of the conspiracy "include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project." *Id.* at 556 (quoting Cohen, *supra*, § 803(1.2)(6)).

Defendant contends that because the State failed to prove Defendant was in a conspiracy with Co-defendants Brown and Orr to rob or steal from the victim, the trial court abused its discretion by admitting Co-defendant Orr's text messages under the co-conspirator's exception to hearsay. The hearsay statements in question include documentation of text messages with no content; a text message from Co-defendant Orr to Defendant, "Shoulld I do her too[?]," sent to Defendant while they were in the car on the drive back to Chattanooga after the victim's death; and a text message sent from Defendant to Co-defendant Orr, "Totally violated brh frfr" along with Co-defendant Orr's response, "Lol luv ya cuz but I'm tryna take care something I got you though[.]"

At the pretrial hearing on Defendant's motion in limine to exclude Co-defendant Orr's cell phone records, defense counsel agreed that Defendant's text message about being violated was admissible but that the evidence should be restricted to make no reference to Defendant's probation. Defense counsel further agreed that Co-defendant Orr's reply would "likely" come in as a response. Thus, on appeal, it appears the only text message Defendant contends to be prejudicial was Co-defendant Orr's text message to Defendant, "Shoulld I do her too[?]" Defendant argues in his brief that this text was highly prejudicial because the State used it to argue that Co-defendant Orr was "looking for [Defendant's] approval to kill [Co-defendant] Brown as a way to cover up what [Co-defendant] Orr had just done, implying that [Defendant] was the ringleader in this chain of events."

At the conclusion of the hearing on the motion in limine, the trial court took the matter under advisement. The trial court subsequently entered a written order concluding, without making any specific factual findings, that the State had proven by a preponderance of evidence the existence of a conspiracy between Defendant and Co-defendants Brown and Orr, and therefore, the text messages between Co-defendant Orr and Defendant were admissible provided the State could prove at trial that the communications were "made during the pendency of the conspiracy and in furtherance of the conspiracy." The trial court further stated: "At this time, the Motion in Limine regarding the text messages and phone communications is denied. However, if the State is unable to prove the conspiracy during the trial on this matter, [D]efendant will be allowed to renew his motion." At trial, Defendant again objected to the admission of the text messages for the same reasons set forth in his motion in limine. Without making any findings as to whether the State had proven the existence of a conspiracy, the trial court announced that its prior ruling stood.

From our de novo review of the facts, we conclude that the evidence presented at the pretrial hearing and at trial preponderates against the trial court's ruling that a conspiracy existed between Defendant and Co-defendants Brown and Orr to rob or steal from the victim. While there is evidence that Defendant accompanied Co-defendant Orr to Loudon County where they picked up Co-defendant Brown and then drove back to the victim's house, there is no evidence of any communication between Defendant and either co-defendant about taking anything from the victim. Co-defendant Brown messaged Co-defendant Orr, about a television in the victim's home, but there was nothing to indicate that Co-defendant Orr wanted the television. Most of the text messages between Co-defendants Brown and Orr concerned Co-defendant Brown's request for a ride from the victim's home and the fact that she and the victim were fighting over money the victim owed her for selling roxies for him. There was no evidence of any communications with Defendant about a robbery or theft. Additionally, the proof showed that the only item taken from the victim's house was his cell phone which Co-defendant Brown already had in her possession.

While there was proof that calls and text messages were exchanged between Defendant and Co-defendant Orr after Co-defendant Orr agreed to drive to Loudon County to pick up Co-Defendant Brown and prior to their departure for Loudon County, the content of those calls and texts was not proven and was thus unknown. Additionally, Co-defendant Brown told police during her prior interviews that Defendant did not enter the victim's home and that Defendant actually told Co-defendant Orr to get back in the car. And when Co-defendant Orr messaged Defendant asking, "Shoulld I do her too[?]," Defendant never responded. His phone records showed that he was watching YouTube during much of the drive back to Chattanooga. This evidence preponderates against the trial court's finding that Defendant was involved in a conspiracy with Co-defendants Brown and Orr.

Moreover, we find that admission of the text message "Shoulld I do her too[?]" was not harmless error as argued by the State. "Harmless error analysis applies to virtually all

- 21 -

evidentiary errors other than judicial bias and denial of counsel." *State v. James*, 81 S.W.3d 751, 763 (Tenn. 2002). Under a harmless error analysis, we must examine the entire record to determine whether the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Rodriguez*, 254 S.W.3d 361, 374 (Tenn. 2008).

The erroneously admitted text message was unclear in its meaning and subject to interpretation. Defendant argues that Co-defendant Orr was asking Defendant if he thought Co-defendant Orr should have sex with Co-defendant Brown based on the fact that they had a relationship approximately ten years ago and had recently reconnected. The State in its closing argument and in its brief argues that Co-defendant Orr was asking Defendant if he should kill Co-defendant Brown to silence her from speaking about Co-defendant Orr's shooting of the victim. In its closing argument, the State repeatedly referenced the text message and asserted that it was a "very critical piece of evidence, because what it shows you is that [Defendant] is part of the decision-making process." The State further argued:

> He's not just along for a ride. He's not afraid of [Co-defendant Orr], like Defense Counsel would suggest to you, because he's involved in the decision-making process. He's being consulted and asked what his thoughts are about disposing of [Co-defendant] Brown. And Defense Counsel would make you think, well, it doesn't make any sense that, you know, he would say no, unless the only reasonable reason he would say that is because he didn't want anything to do with that. Now, there's a lot of reasons that you don't want to stack up another dead person on top of the one that you just left lying on the floor in Loudon. Especially when you're driving down the interstate.

Because there is scant, if any, evidence in this case showing that Defendant committed the charged offenses, the erroneous admission of Co-defendant Orr's text message to Defendant more probably than not affected the verdict. *See Rodriguez*, at 372; Tenn. R. App. P. 36(b). Thus, based on this claim, had we not found the evidence insufficient to support Defendant's convictions, Defendant's convictions would be reversed and remanded for a new trial.

### III.    Reference to "Street Gang Unit"

Generally, relevant evidence is admissible. Tenn. R. Evid. 402. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* 401. However, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" *Id.* 403. Unfair prejudice means "[a]n undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Tenn. R. Evid. 403, Advisory Comm'n Comment).

This court reviews a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *Id.* Mere disagreement with the trial court is insufficient to disturb the trial court's evidentiary decisions. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Defendant argues that the trial court erred by overruling his objection and allowing Special Agent Legg to testify that he "met with [Chattanooga's] street gangs unit" to "see if they were familiar" with Defendant. He contends that the single reference to the gang unit was unfairly prejudicial. However, as argued by the State, this evidence was relevant to show how Defendant was identified by law enforcement as they only had his nickname, "Money," at the time and did not know his location. Special Agent Legg did not testify that Defendant was in a criminal gang or that he associated with one, and the State never asked whether Defendant was in a gang.

In *State v. Duncan*, the defendant argued that the officers' testimony concerning their work in the gang unit of the Jackson police department resulted in prejudice. No. W2017-00529-CCA-R3-CD, 2018 WL 1182579, at *5 (Tenn. Crim. App. Mar. 6, 2018). However, this court found that Defendant was not entitled to relief "because the officers' testimony amounted to nothing more than a basic description of their job duties. The officers' testimony is no different than a medical examiner testifying about his work in examining deceased bodies." *Id.* We note that in *Duncan*, there was additional gang-related evidence presented at trial which along with the officers' testimony did not prejudice the defendant's trial. *Id.* at *6.

Thus, we conclude that the single reference to the Chattanooga "street gangs unit" did not prejudice Defendant's trial in this case. The trial court did not abuse its discretion in admitting the evidence as it was relevant to establishing Defendant's identity. Defendant is not entitled to relief on this issue.

IV.     Prosecutorial Misconduct During Closing Argument

Defendant contends that during closing argument, the State violated his right to a fair trial by repeatedly referring to his nickname, "Money," "by creating misleading inferences that were not based on the proof, and by generally alluding to fear-mongering themes of racial stereotypes and gang violence." Defendant concedes that he did not object to the prosecutor's remarks during closing argument but requests that we review this issue for plain error. The State argues that Defendant is not entitled to plain error relief.

Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If any one of these factors is not satisfied, we do not need to consider the remaining factors. *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016).

Closing arguments are valuable tools for both the prosecution and the defense, and the Tennessee Supreme Court has historically allowed wide latitude to counsel in arguing their cases during closing arguments. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). "Trial judges in turn are accorded wide discretion in their control of those arguments." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. 2003) (quoting *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995)). In order to properly bring an issue regarding closing argument forward on appeal, the complaining party must have objected to the argument contemporaneously. *State v. Robinson*, 146 S.W.3d 469, 518 (Tenn. 2004); *see State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997).

In *Judge v. State*, this court determined five factors to consider to determine whether there has been prosecutorial misconduct in closing arguments: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Courts also "take[] into account whether the improper remark of the prosecutor was made in response to the defendant's comments or argument." *Id.*; *see also* Tenn. R. Crim. P. 29.1(c)(2) ("The state's final closing argument is limited to the subject matter covered in the state's first closing argument and the defendant's intervening argument.").

In *State v. Goltz*, the Tennessee Supreme Court outlined "five general areas of prosecutorial misconduct" that can occur during closing arguments: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or the defendant's guilt; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. *Goltz*, 111 S.W.3d at 5.

Here, Defendant contends that the State's violated his right to a fair trial during closing argument by repeatedly using his nickname "Money," "by creating misleading inferences that were not based on the proof, and by generally alluding to fear-mongering

themes of racial stereotypes and gang violence." He further argues that the State's closing argument invited the jury to make "inappropriate assumptions about the parties' appearances and behaviors" by trying to make the case about "gangs and racial stereotypes, fanning the flames of fear and bias," and inviting the jury to make inappropriate assumptions about the parties' appearances and behaviors. Defendant also asserts that during its rebuttal argument, the State misrepresented facts by insinuating that Co-defendant Orr responded to Co-defendant Brown's request for "shootas" when Ms. Brown testified at trial that she sent that message to another person on behalf of someone else in a related matter.

We have reviewed the transcript of the trial testimony and closing arguments and determine that the prosecutor's statements, while pushing the boundaries, did not violate Defendant's right to a fair trial. Regarding the prosecutor's use of Defendant's nickname, although nicknames "should generally be avoided," there is no outright prohibition against their use. *Zirkle*, 910 S.W.2d at 886; *State v. Robinson*, No. W2016-01803-CCA-R3-CD, 2017 WL 5952925, at *4 (Tenn. Crim. App. Nov. 29, 2017). Further, the nickname "Money" was relevant to Defendant's identity and was not connected with any gang affiliation.

While we agree that the State identified parties by race and appearance, it used facts in evidence as descriptions and characterized the victim and other parties as it did the co-defendants. "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *State v. Banks*, 271 S.W.3d 90, 131 (citation omitted).

Regarding the claim that the state misrepresented facts in its rebuttal argument, the State did not argue that Co-defendant Orr received the text message from Co-defendant Brown asking for "shootas." It presented the facts that after Co-defendant Brown sent the message, Defendant and Co-defendant Orr drove to pick up Co-defendant Brown and that they had a gun. Only in "exceptional circumstances" do errors reviewed under the plain error doctrine warrant reversal. *Id.* at 132, n.30. We do not find exceptional circumstances exist in this case.

Upon review, we conclude that no clear and unequivocal rule of law was breached, no substantial right of the accused has been adversely affected, and consideration of the error is not necessary to do substantial justice. Because Defendant has not established the criteria for plain error review, he is not entitled to relief on this issue.

## CONCLUSION

Because the evidence was insufficient to sustain the convictions, the judgments of the trial court are reversed and the charges are dismissed with prejudice. Even if the

evidence had been sufficient, the trial court erred by admitting into evidence the text message by Co-defendant Orr, and this is reversible error. If this court were not dismissing the charges, Defendant would be entitled to a new trial.

s/ *Jill Bartee Ayers*

JILL BARTEE AYERS, JUDGE